UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ISRA Vision, AG,

    Plaintiff,

v.

Burton Industries, Inc.

    Defendant.
                                     /

Case No. 07-11559

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [32] AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [35]**

    Plaintiff ISRA Vision, AG filed this action against Defendant Burton Industries, Inc. for breach of contract. ISRA claims that Burton has failed to pay ISRA the $700,320.27 it is owed as the assignee of a contract between Burton Industries, Inc. and ASM Dimatec Ingenieria, S.A. Defendant Burton Industries, Inc. asserts that it does not owe ISRA any money because Burton's contract with Dimatec prohibited assignments without written notice and that, even if the assignment to ISRA were enforceable, the amount owed has been reduced due to Dimatec's failure to complete its obligations under the contract. This matter comes before the Court on the parties' cross-motions for summary judgment. For the reasons set forth below, Defendant's motion is DENIED and Plaintiff's motion is GRANTED IN PART AND DENIED IN PART.[1]

**I.    Facts**

**Burton-Dimatec Purchase Order**

---

[1] The Court also DENIES Defendant's Motion to Strike Plaintiff's Declaration [43].

Defendant Burton Industries, Inc. is a Michigan corporation that designs and builds automation, including robotic systems for the automobile industry. (Def.'s Ex. 1, at ¶3.) General Motors requires companies to be global suppliers with an international presence or a formal relationship with international companies in order to submit global bids. (Def.'s Ex. 1, at ¶5.) In January of 2005, Burton was looking for a global partner to represent it in Europe, so that Burton could submit global bids to General Motors. (Def.'s Ex. 1, at ¶6.) Burton learned of ASM Dimatec Ingenieria, S.A., a Spanish corporation that designs, builds, markets, and installs pressroom equipment, automation, and other systems for automotive-related industries. (Def.'s Ex. 1, at ¶7.)

On May 24, 2005, Burton and Dimatec signed a Cooperation Agreement, with the stated purpose of "establish[ing] a cooperative relationship for the performance of activity supporting sales, marketing, designing, building, installing and servicing of automation, handling and assembly systems in the _North American and/or Global Marketplace_." (Def.'s Ex. 2, at 2.) The Agreement included the following provisions relevant to the present dispute:

> Background:
> \* \* \*
> The following is the first phase of the two companies working agreement.
>
> 2. Rights
> \* \* \*
> It is agreed upon that nothing in this agreement will determine any conditions or prices for the products and so on. All conditions shall be fixed by mutual agreement on an individual order basis.
>
> 4. Service
> \* \* \*
> All costs and expenses during the system warranty period will be at agreed upon rates and will be back-charged to the provider of the equipment being serviced and has to be agreed upon by both parties.

> 8.7. Assignment
> Since this agreement requires the performance of personal services by the parties, neither party may assign any right or delegate any duty described in this agreement without prior written approval of the other.

(Def.'s Ex. 2.)[2]

Following the signing of the Agreement, Dimatec gave Burton a quotation for Dimatec's portion of work on a proposed project for General Motors and worked with Burton to develop a complete quotation for the GM project. On January 3, 2006, Burton and Dimatec presented their joint proposal and quotation to GM to build an end of line system. (Def.'s Ex. 6.) On February 17, 2006, GM sent Burton Purchase Order TCS87562 for the end-of-line system. (Def.'s Ex. 7.) The reverse side of each page of the GM Purchase Order contained terms and conditions, which included the following:

> 11. INSOLVENCY:
> \* \* \*
> Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorney's or other professional fees.
>
> 23. SETOFF/RECOUPMENT:
> In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries; and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.
>
> 27. NON-ASSIGNMENT:
> Unless otherwise specifically prohibited by applicable law, Seller may not assign or delegate its rights or obligations under this contract without Buyer's prior written consent.
>
> 31. Entire Agreement:

---

[2] The Agreement also provides that it is governed by the laws of Switzerland and that any disputes will be finally settled by arbitration. (Def.'s Ex. 2, at §§8.5, 8.6.)

3

> This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supercedes all prior oral or written representations and agreements. This contract may only be modified by a contract amendment issued by Buyer.

(Def.'s Mot., at 3; Def.'s Exs. 7, 8.)[3] The GM Purchase Order set the delivery date for the completed system as October 8, 2006. (Def.'s Ex. 1, at ¶18.)

On February 22, 2006, Dimatec sent Burton a statement of its responsibilities and specifications for Dimatec's portion of the GM project. (Def.'s Ex. 4, at ¶11; Def.'s Ex. 10.) On March 7, 2006, Burton sent Dimatec five pages via facsimile, which included: (1) "general terms and conditions" identical to those that had appeared on the back of the GM purchase order; (2) Purchase Order No. 070192 from Burton Industries, Inc. to Dimatec for end-of-line equipment in the amount of $991,046; and (3) a three-page description on Dimatec letterhead of Dimatec's portion of the end-of-line system and equipment specification summary. (Pl.'s Ex. F.) Mr. Moya, the President and CEO of Dimatec, and Mr. Johnson, Vice-President of Manufacturing for Burton, both testified that the GM terms and conditions "became part of the Burton Purchase Order to Dimatec." (Def.'s Ex. 4, at ¶¶2-11; Def.'s Ex. 9, at 51; Def.'s Ex. 1, at ¶16.)

Shortly thereafter, Burton, Dimatec, and The State Bank entered into a Banking Agreement for the purpose of creating a demand deposit account for receiving and distributing the money Burton was to receive from General Motors for the end-of-line system. (Def.'s Ex. 4, at ¶12; Def's Ex. 27.) At this time, the GM Purchase Order was for

---

[3] The terms and conditions also include a choice of law and forum provision, which suggest that Michigan law governs and that any disputes are to be settled by a court with jurisdiction over the parties. (Def.'s Ex. 8, at §29.)

$2,345,141, of which Dimatec was to receive $991,046.  (Def.'s Ex. 4, at ¶13.)

Dimatec began to perform under the Purchase Order but was unable to complete its work due to financial difficulties.  (Def.'s Ex. 4, at ¶¶14-15.)  Johnson testified that Dimatec shipped an incomplete system to Burton in August of 2006, which required Burton to complete, or to hire third parties to complete, Dimatec's work under the Purchase Order.  (Def.'s Ex. 1, at ¶¶25-31.)  Johnson testified that Dimatec did not provide or complete the following items under the Purchase Order: vision hardware and software, the unload tray, assembly of the conveyor, all purchased items for the conveyor, documentation, and engineering.  (Def.'s Ex. 3, at 42.)

Serafi Suller, Dimatec's former production manager, testified that he and the other Dimatec executives understood that there would be a reduction in the amount owed to Dimatec because Burton was required to complete Dimatec's work on the GM project.  (Def.'s Ex. 5, at 81-82, 109-10.)  Suller testified that he corresponded with Johnson regarding the specifics of Burton's completion of various aspects of Dimatec's work.  (Def.'s Ex. 5, at 98-105.)  Suller also testified that Dimatec sent Burton parts for a six-lane conveyor, but not a completed six-lane conveyor.  (Def.'s Ex. 5, at 108.)

Julia Martin, the engineering manager of the GM project for Dimatec, testified that Dimatec was unable to fulfill its contract for the conveyor and manual unload table and shipped unfinished products to Burton in the fall of 2006 so that Burton could finish them.  (Def.'s Ex. 17, at ¶¶9-23.)  Martin also testified that Dimatec was unable to pay its subcontractor, and that Martin provided Burton with the subcontractor's purchase orders in March of 2007 so that Burton could pay the bills and deduct the amount from the balance due to Dimatec.  (Def.'s Ex. 17, at ¶¶24-25.)

5

**Dimatec-ARE Assignment**

On August 2, 2006, Dimatec and the Spanish corporation, Maxmalia Investor, S.L., entered into a Partial Assets and Liabilities Assignment and Personal Guarantee, whereby Dimatec transferred all of its assets and obligations to Maxmalia.  (Pl.'s Ex. G.)  The Assignment listed the GM-Burton Purchase Order as one of Dimatec's orders in progress, with the following notation: "Assembly in Reus.  Value will be adjusted as Burton assumes some of our works."  (Def.'s Ex. 15; Pl.'s Ex. G.)  Moya, Dimatec's President and CEO, testified that according to the Assignment signed between Dimatec and Maxmalia, Maxmalia was obligated to complete Dimatec's works in progress, including the Burton Purchase Order.  (Pl.'s Ex. D, at 79.)  Andres Balmaceda, the Managing Director of ARE, similarly testified that this Assignment transferred all aspects of the Burton-Dimatec project, including the right to payment, to Maxmalia.  (Pl.'s Ex. A, at ¶4.)

Maxmalia subsequently changed its name to ASM Automation Robotics and Engineering Designers, S.L. ("ARE").  (Pl.'s Ex. A, at ¶4.)  Upon signing this agreement with Maxmalia/ARE, Dimatec ceased its business operations.  (Pl.'s Ex. D, at 79.)  Burton alleges that ARE was created in 2006 and occupied the same address as Dimatec.  (Def.'s Mot. at 1.)

In November of 2006, Frank Torres of Dimatec/ARE, traveled to the U.S. to negotiate with Burton changes to the Dimatec-Burton Purchase Order, which resulted in a reduction in Dimatec's obligations and payment.  (Pl.'s Ex. A, at ¶6; Def.'s Ex. 4, at ¶¶17-21.)[4]  In December of 2006, the parties entered into a Second Banking Agreement reflecting the

---

[4] Johnson of Burton contends that he did not know that there were two entities, Dimatec and ARE, until ISRA became involved.  (Def.'s Ex. 1, at ¶¶39-40.)

renegotiated Purchase Order of $770,320.27.  (Def.'s Ex. 4, at ¶¶17-21.)

**ARE-ISRA Assignment**

ISRA Vision, AG is a German corporation that manufactures machine vision systems. (Pl.'s Ex. B, at 5-7.)  Between October 20, 2006 and January 5, 2007, ISRA made a series of loans to ARE.  (Pl.'s Ex. A, at ¶9.)  As payment for amounts due on those loans, ARE assigned to ISRA €670,000 worth of its accounts receivable from Burton Industries, Inc. for the GM Purchase Order.  (Pl.'s Ex. A, at ¶9; Pl.'s Ex. B, at 17-19, 73; Pl.'s Ex. H.)[5]  Enis Ersu, ISRA's CEO testified that ARE informed ISRA that there was no problem with the Burton-Dimatec receivable and that the money would be coming soon.  (Def.'s Ex. 12, at 19.)

On February 27, 2007, ISRA's attorney informed Burton by letter of this assignment and requested that Burton make payments under the Purchase Order to ISRA.  This was the first notification Burton had received of any assignment of the Burton-Dimatec Purchase Order.  (Def.'s Ex. 3, at 22; Def.'s Ex. 1, at ¶40; Pl.'s Ex. H.)  On February 28, 2007, Burton e-mailed Frank Torres of Dimatec asking for clarification of the ISRA letter.  (Def.'s Ex. 24.)

---

[5] Burton contends that ISRA had taken control of Dimatec by 2006.  (Def.'s Mot. at 8.)  Burton points to an August 20, 2006 e-mail from ISRA's Vice President to Mr. Torres and Mr. Moya of Dimatec proposing rules for copying particular staff members at Dimatec and ISRA on e-mails pertaining to various aspects of Dimatec's operations.  (Def.'s Ex. 22.) Burton also points to a September 19, 2006 e-mail from ISRA CEO Enis Ersu to several Dimatec and ISRA executives naming four ISRA management employees as contacts for Dimatec employees.  (Def.'s Ex. 23.)  Martin Heinrich, ISRA's financial officer, testified that ISRA has never had an ownership interest in Dimatec, Maxmalia, or ARE and that these e-mails merely reflect the fact that four ISRA employees were under contract to provide consulting services to ARE.  (Def.'s Ex. 28.)  Heinrich also testified that ISRA was in negotiations with Moya of Dimatec in the spring of 2006, but that these negotiations failed. (Def.'s Ex. 14, at 63-65; Def.'s Ex. 28.)  This factual dispute is not relevant to the matter before this Court.

7

Burton alleges that on March 9, 2007, ISRA's attorney mailed Burton an invoice from ARE dated October 10, 2006 for $700,000. (Def.'s Mot. at 10.)

**Bankruptcy Proceedings**

On March 5, 2007, a Spanish court ordered Dimatec into involuntary bankruptcy. (Def.'s Ex. 25.) On March 23, 2007, a Spanish court granted ARE's declaration of voluntary bankruptcy. (Def.'s Ex. 26.) The Dimatec-Burton Purchase Order was claimed as an asset by the Insolvency Directors in both the Dimatec and ARE bankruptcies. (Def.'s Ex. 4, at ¶28.)

On February 18, 2008, the Spanish court identified ISRA as a director-in-fact of Dimatec and placed a lien on ISRA and several individual executives for €8,685,562.14 due to ISRA's possible involvement in Dimatec's bankruptcy. (Def.'s Ex. 21.)

**Additional Claimed Set-offs Following Second Banking Agreement**

In February of 2007, Mr. Johnson of Burton contacted Frank Torres of Dimatec/ARE regarding the outstanding items for the Burton-Dimatec Purchase Order. (Def.'s Ex. 3, at 54.) Mr. Torres informed Johnson that because of Dimatec's bankruptcy, Johnson should contact the administrators that Dimatec had been assigned by the bankruptcy court. (Def.'s Ex. 3, at 54.)

In March of 2007, Johnson flew to Spain and met with Dimatec's Insolvency Directors to provide information regarding the money owed to Dimatec by Burton and additional set-offs to the Burton-Dimatec Purchase Order for the period from December 2006 to June 2007. (Def.'s Ex. 1, at ¶42; Def.'s Ex. 4, at ¶30.) The Insolvency Directors determined that an additional $252,787.45 was permitted as set-offs from the Second Banking Agreement.

8

(Def.'s Ex. 1, at ¶43.)  Mr. Moya and Mr. Torres of Dimatec reviewed Burton's calculated set-offs and communicated to the Insolvency Directors that they seemed correct, at least as an approximation.  (Def.'s Ex. 9, at 37-38; Def.'s Ex. 3, at 59.)

On June 11, 2007, the Insolvency Directors modified the Second Banking Agreement to reflect the fact that the total amount to be paid by GM to Dimatec would be $517,532.82.  (Def.'s Mot. at 11.)  No one from ARE or ISRA participated in the negotiation of the Third Banking Agreement.  (Def.'s Ex. 3, at 58.)  In light of the filing of ISRA's lawsuit, Burton paid the money into the registry of this Court instead of to the Insolvency Directors.  (Def.'s Ex. 1, at ¶47.)

Johnson testified that there was an additional 10% hold back for warranty work by Dimatec for a period of two years, resulting in an additional reduction of $51,753.28.  (Def.'s Ex. 1, at ¶¶44-46.)  According to Johnson, this brought the balance due as of June 2007 to $465,779.54, with the remaining balance of the warranty money to be delivered to Dimatec once the two-year warranty period elapses.  (Def.'s Ex. 1, at ¶49.)  Mr. Moya of Dimatec also testified to these figures.  (Def.'s Ex. 4, at ¶¶30-32.)

Johnson testified that Burton was entitled to additional set-offs for work that Burton performed for Dimatec after June 2007.  Johnson testified that Burton spent $33,692.32 on mechanical engineering, $8306.50 on a gravity pin stand and door changes, $16,051.20 to complete a motion study, and $27,946 on liability insurance.  (Def.'s Ex. 1, at ¶48.)  Johnson testified that Burton may incur additional warranty charges due to claims regarding conveyor problems.  (Def.'s Ex. 1, at ¶48.)[6]  Johnson also testified that Burton

---

[6] Burton shipped the majority of the project to GM between March 21, 2007 and April 16, 2007.  (Def.'s Ex. 1, at ¶53.)

incurred $80,191.14 in fees and costs associated with Dimatec's bankruptcy proceedings as well as $118,549.21 in attorney fees to defend ISRA's claim in this litigation. (Def.'s Ex. 1, at ¶55-56).[7] Johnson testified that as of January 29, 2009, Burton owes Dimatec a total of $179,688.63. (Def.'s Ex. 1, at ¶57.)

By contrast, Mr. Balmaceda, the Managing Director of ARE, testified that Burton and ARE never agreed upon any subsequent reductions to the Purchase Order after the Second Banking Agreement. (Pl.'s Ex. A, at ¶8.) Balmaceda also testified that ARE "substantially completed all of the work it committed to complete per renegotiated Purchase Order No. 070192, with one exception." (Pl.'s Ex. A, at ¶7.) Balmaceda testified that ARE had subcontracted the conversion of certain drawings, but because ARE went into bankruptcy, it could not afford to pay its subcontractor. (Pl.'s Ex. A, at ¶8.) As a result, in March of 2007, Burton assumed this aspect of the work, valued at approximately $70,000. (Pl.'s Ex. A, at ¶8.)

ISRA's financial officer, Martin Heinrich, and ISRA's CEO, Enis Ersu, both testified that they did not know how much money Burton owes Dimatec. (Def.'s Ex. 14, at 47; Def.'s Ex. 12, at 133-34.) Both also testified that they did not know if ARE did the work required under the Burton-Dimatec Purchase Order. (Def.'s Ex. 12, at 32; Def.'s Ex. 14, at 60-61.) Mr. Heinrich testified that he did no investigation as to whether work had been done on the Purchase Order after October 5, 2006. (Def.'s Ex. 14, at 61.)

**Procedural History**

On April 5, 2007 ISRA filed a Complaint against Burton for breach of contract.

---

[7] It is unclear on what basis Burton claims reimbursement for its attorney fees in this litigation.

(Docket Text #1.) On May 4, 2007, Burton filed a Counterclaim for Interpleader, asserting that the dispute regarding ownership of the funds seemed to be between Dimatec and ISRA and requesting that the Court allow Burton to interplead funds totaling $588,874.06 into the registry of the Court and be dismissed from the action. (Docket Text #5.) On June 6, 2007, ISRA filed a motion to dismiss Burton's Counter-Complaint, which was granted by stipulated order on November 29, 2007. (Docket Text #22.) In January of 2009, the parties filed cross-motions for summary judgment, which are now before the Court.

## II.     Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather must "set

out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

Burton contends that it is entitled to summary judgment in its favor because the assignments of the Burton-Dimatec Purchase Order—from Dimatec to ARE and from ARE to ISRA—were barred by contract and common law. Burton argues in the alternative that, even if the assignments are enforceable, ISRA would be entitled to $179,688 rather than the $700,320.27 ISRA claims it is owed. Burton finally argues that this Court should decline to enforce the ISRA assignment in light of the Spanish bankruptcy proceedings.

ISRA contends that summary judgment in its favor is appropriate because its right to collect on the Dimatec-Burton Purchase Order is based on a valid, permissible assignment. ISRA further contends that it is entitled to payment in the amount of $700,320.27 based on ARE's performance of Dimatec's obligations under the Purchase Order.

### A. Validity of ISRA's Assignment

Burton argues that ISRA's assignment is unenforceable in light of the non-assignment clauses in both the Cooperation Agreement and the Burton-Dimatec Purchase Order. "The general presumption . . . is that a contractual right may be assigned, but conversely that assignment may also be precluded by agreement." *Edwards v. Dev. Corp.*, No. 174487, 1996 WL 33358104, *1 (Mich. Ct. App. Sept. 17, 1996).[8] Moreover, "there is no prohibition

---

[8] In light of the fact that both parties rely exclusively on Michigan law, the Court applies Michigan law to this dispute.

12

against requiring consent to effectuate an assignment." *Id.*

ISRA responds, however, that (1) the non-assignment clause in the Cooperation Agreement between Burton and Dimatec is inapplicable since the Purchase Order, and not the Cooperation Agreement, was assigned; and that (2) the non-assignment clause contained in the GM Terms and Conditions never became part of the Burton-Dimatec Purchase Order.

The Court agrees that the non-assignment clause in the Burton-Dimatec Cooperation Agreement does not apply to Dimatec's assignment of the Burton-Dimatec Purchase Order. "As a general rule, contractual restrictions against assignability are strictly construed." *Edwards*, 1996 WL 33358104, at *1. The Cooperation Agreement was only "the first phase of the two companies' working agreement," and established the terms for their relationship as global partners. (Def.'s Ex. 2.) As such, the non-assignment clause applied to Burton's global partnership with Dimatec rather than any one purchase order. The limited scope of the Agreement's terms is underscored by the provision stating that "nothing in this agreement will determine any conditions or prices for the products and so on. All conditions shall be fixed by mutual agreement on an individual order basis." (Def.'s Ex. 2.) The assignment at issue in this dispute is not Dimatec's assignment of its global partnership with Burton but, rather, its assignment of the GM purchase order. For this reason, the non-assignment clause in the Cooperation Agreement is inapplicable.

Determining whether the non-assignment clause contained in the GM Terms and Conditions became part of the Burton-Dimatec Purchase Order requires application of Michigan's version of the Uniform Commercial Code § 2-207, M.C.L. 440.2207. Section 440.2207 provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
>> (a) the offer expressly limits acceptance to the terms of the offer;
>>
>> (b) they materially alter it; or
>>
>> (c) notifications of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

M.C.L. 444.2207.

First, the Court must "repair to the record and the totality of the circumstances" to determine "what constituted the offer and what was the acceptance." *Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1203 (6th Cir. 1981). In this case, Dimatec submitted a quotation to Burton for its portion of the GM project along with a description of Dimatec's proposed responsibilities. After Burton received the GM Purchase Order, Burton sent Dimatec a five-page facsimile, which included along with the one-page Purchase Order, a description of Dimatec's responsibilities and General Terms and Conditions identical to those that appeared on the back of the GM Purchase Order. (Pl.'s Ex. F.) Following receipt of the facsimile, Dimatec began performance. This record "compel[s] a finding that [Dimatec's] [quotation] was an offer which was accepted by [Burton] through

its purchase order." *Mead*, 654 F.2d at 1203. And pursuant to M.C.L. 444.2207(1), the Purchase Order is treated as an acceptance even though "it states terms additional to or different from those offered or agreed upon"—namely the General Terms and Conditions.

Second, the Court must determine whether the non-assignment clause contained in the General Terms and Conditions attached to the Purchase Order became part of the contract even though the parties did not expressly agree to its inclusion. The non-assignment clause became part of the contract unless it "materially alter[s] it." M.C.L. 444.2207(2)(b). An additional term is a material alteration if it "results in surprise or hardship if incorporated without the express awareness by the other party." *Plastech Eng'd Prods. v. Grand Haven Plastics, Inc.*, No. 252532, 2005 WL 736519, *5 (Mar. 31, 2005) (internal citations and quotation marks omitted). This Court "consider[s] many factors in determining whether a party was unreasonably surprised by an additional term, such as prior course of dealing; the number of confirmations exchanged; absence of industry custom; whether the addition was clearly marked; and whether the addition is contained within the party's own standard contract." *Id.* "[T]he analysis of the existence of hardship focuses on whether the clause at issue would impose substantial economic hardship on the nonassenting party." *Id.* (internal citations and quotation marks omitted).

The non-assignment clause departs from the default rule under the Uniform Commercial Code — that contract rights and duties are freely assignable — and there is no evidence in the record that the parties ever discussed the inclusion of this term in their contract. M.C.L. 440.2210. Moreover, the clause imposes a substantial hardship on

15

Dimatec by limiting the flexibility of the contract, which, in turn, decreases its value.[9] Because the non-assignment clause would have materially altered the contract, it did not become part of the Burton-Dimatec Purchase Order as a matter of law. As such, ISRA's assignment is enforceable.[10]

Burton contends that even if the contractual provision prohibiting assignments does not apply, ISRA's assignment is unenforceable under common law and under the Uniform Commercial Code. First, Burton argues that Dimatec's assignment of its obligations under the Purchase Order to ARE should be voided because the Purchase Order was a personal service contract. "[A]n obligor may delegate a contractual duty 'provided the duty does not

---

[9] The Court finds no Michigan case addressing whether a non-assignment clause is considered a material alteration. Courts have, however, found indemnity provisions, *see Power Press Sales Co. v. MSI Battle Creek Stamping*, 238 Mich. App. 173 (Mich. Ct. App. 1999), consequential damages clauses, *see Mead*, 654 F.2d at 1204 n.11, and forum selection clauses, *see Metro. Alloys Corp. v. State Metals Indus.*, 416 F.Supp.2d 561 (E.D. Mich. 2006), to materially alter a contract. Based on this precedent, the Court is confident that a Michigan court would deem a non-assignment clause to be a material alteration.

[10] Even if the non-assignment clause were to apply to the Burton-Dimatec Purchase Order, Burton would not necessarily be entitled to withhold payment from ISRA. The non-assignment clause at issue in this case prohibits assignment of rights or obligations without written notice but does not state that any assignment will be void. The modern trend has been to interpret such clauses as limiting *the right to assign* but not *the power to assign*. That is, assignments pursuant to such clauses constitute a breach of the contract for which the assignor may be liable in damages, but are not deemed invalid. *See, e.g.*, *Oliver/Hatcher Constr. and Dev., Inc. v. Shain Park Assocs.*, No. 275500, 2008 WL 2151716, *3-*4 (Mich Ct. App. May 22, 2008) (assignment not void where contract prohibited assignments without consent but did not "specifically sa[y] . . . that assignments without consent were void."); *Bel-Ray Co. v. Chemrite (Pty), Ltd.*, 181 F.3d 435, 441-43 (3d Cir. 1999) (same) (applying New Jersey law); *Hy King Assocs, Inc. v. Versatech Mfg. Indus., Inc.*, 826 F.Supp. 231, 238-39 (E.D. Mich. 1993) (assignment void where contract stated that "[a]ny attempt at assignment without such written consent shall be deemed null and void and of no effect."); *Cf. Ferndale Labs., Inc. v. Schwarz Pharma, Inc.*, 123 F.App'x 641 (6th Cir. 2005) (violation of non-assignment clause brought as breach of contract action).

require personal performance.'" *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich. App. 486, 510 (Mich. Ct. App. 1998) (quoting 3 Williston, Contracts, § 411). But "[p]ersonal performance will not be implied in the absence of an express agreement 'if the duty is of such character that performance by an agent will be substantially the same thing as performance by the obligor himself.'" *Id.* The court in UAW rejected the argument that a contract for the provision of hotel facilities for a convention was personal because "the duty is of a character that easily lends itself to substituted performance" and "is far removed from traditional personal service contracts such as an artist's contract to paint a portrait or a doctor's contract to perform complicated surgery." *Id.* Similarly, because the building of automation systems "lends itself to substituted performance," assignment of the duty is not void as a personal services contract.

Second, Burton contends that the ISRA assignment is prohibited by Michigan's version of the Uniform Commercial Code, MCL 440.2210(1), which states that "all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on the other party." Burton argues that the ISRA assignment increases its burden because ISRA, unlike Dimatec, refuses to acknowledge Burton's right to set-offs. But, as this Court explains, *see infra* Part IIIB, ISRA is only entitled to be paid the amount that Dimatec is owed under the Purchase Order. Moreover, Burton's reliance on *Kingston v. Markward & Karafilis, Inc.*, 134 Mich. App. 164 (Mich. Ct. App. 1984), is misplaced. In *Kingston*, an assignment of an indemnification agreement was found to materially increase the burden or risk on the obligor where it had the effect of requiring the obligor to indemnify two entities instead of one. *Id.* at 173-75. By contrast, ISRA's assignment merely requires Burton to

17

pay the same amount of money to a different entity.

### B. Amount Owed

"An assignee stands in the position of the assignor, possessing the same rights and being subject to the same defenses." *Burkhardt v. Bailey*, 260 Mich. App. 636, 653 (Mich. Ct. App. 2004); *see also Edwards*, 1996 WL 33358104, at *2. While ISRA is entitled to payment in accordance with its assignment, it is only entitled to the amount that Burton owed Dimatec.

Burton claims that, in light of Dimatec's failure to complete its work under the purchase order, Burton only owes ISRA $179,688.63. Mr. Johnson, Mr. Moya, and several former Dimatec employees testify to the work that Burton was required to perform for Dimatec in order to complete the GM Purchase Order.

ISRA contends that it is owed $700,320.27, and supports this claim with testimony from Mr. Balmaceda, the Managing Director of ARE. Balmaceda testifies that ARE completed all of the work on the renegotiated purchase order worth $770,320.77, except for the conversion of certain drawings valued at approximately $70,000. (Pl.'s Ex. A, at ¶¶8-9.)

While Burton has presented more support for its position than ISRA, the Court will not weigh the parties' evidence on summary judgment. In light of the conflicting testimony, the Court finds that genuine issues of material fact remain on the issue of how much money Burton owes ISRA on the Burton-Dimatec Purchase Order.[11]

---

[11] ISRA argues that Burton is not entitled to any set-offs since the set-off provision was part of the GM Terms and Conditions that were not incorporated into the Burton-Dimatec Purchase Order. This argument is misguided in light of the fact that Burton would be entitled to set-offs and recoupment under common law. Burton may not, however, be

18

### C. Jurisdiction

Burton contends that this Court should decline to exercise jurisdiction over this case because Dimatec and ARE are currently in bankruptcy proceedings in Spain, and because the Spanish court has executed a lien on ISRA. In light of the fact that neither party to this litigation is currently a debtor in a bankruptcy proceeding, this Court retains jurisdiction to resolve this dispute.

### IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is DENIED and Plaintiff's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Plaintiff's motion for summary judgment is GRANTED with respect to the validity of the assignment but DENIED as to the amount of damages owed.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: August 7, 2009


I hereby certify that a copy of the foregoing document was served upon counsel of record on August 7, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

---

entitled to *all* of the set-offs it claims. It is not clear, for example, that Burton would, as a matter of law, be entitled to deduct attorney fees for this litigation.